**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR04-4082-MWB |
| vs. | **ORDER REGARDING** |
| | **MAGISTRATE'S REPORT AND** |
| ANNA DOSE, a/k/a Ann Dose, CARLA | **RECOMMENDATIONS** |
| WEBER, and LARRY HINMAN, | **CONCERNING DEFENDANTS'** |
| | **PENDING MOTIONS** |
| Defendants. | |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    *A.  Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    *B.  Objections To Report and Recommendations* . . . . . . . . . . . . . . . . . 18
        *1.      Multiplicity of Counts Two and Three* . . . . . . . . . . . . . . . 18
        *2.      Multiplicity of Counts Four and Five* . . . . . . . . . . . . . . . 20
        *3.      Multiplicity of the § 1001 and the § 1035 Counts* . . . . . . . . 21
        *4.      The Sufficiency of the Second Superceding Indictment* . . . . 29
            *a.      Standards for dismissal of an indictment* . . . . . . . . . 29
            *b.      Analysis of the sufficiency of particular counts* . . . . . 31
                *i.      Counts 2 through 5* . . . . . . . . . . . . . . . . . . . 31
                *ii.     Count 6* . . . . . . . . . . . . . . . . . . . . . . . . . 38
                *iii.    Count 1* . . . . . . . . . . . . . . . . . . . . . . . . . 40

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On September 27, 2004, a nine count Superseding Indictment was returned against defendants Anna Dose, Carla Weber and Larry Hinman, charging them with: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371; health care fraud, in violation of 18 U.S.C. §§ 1347 and 2; making false statements related to health care matters, in violation of 18 U.S.C. §§ 1035 and 2; making false statements to the Health Care Financing Administration, in violation of 18 U.S.C. §§ 1001 and 2; and obstruction of a federal audit, in violation of 18 U.S.C. §§ 1516 and 2. On February 16, 2005, a six count Second Superseding Indictment was returned against defendants Dose, Weber and Hinman, charging them with: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371; making false statements related to health care matters, in violation of 18 U.S.C. §§ 1035 and 2; making false statements to the Health Care Financing Administration, in violation of 18 U.S.C. §§ 1001 and 2; and obstruction of a federal audit, in violation of 18 U.S.C. §§ 1516 and 2.

Defendants Anna Dose and Larry Hinman have each filed motions to dismiss.[1] Defendant Dose has filed a motion to dismiss Counts Three and Five of the Second Superseding Indictment on the basis of double jeopardy (Dkt. #106). Defendant Hinman has filed a motion to dismiss, or to require the Government to elect between, "multiplicitous counts" in the Second Superseding Indictment (Dkt. #113). The government filed a joint resistance to Dose's and Hinman's motions to dismiss.[2]

---

[1]Dose and Hinman will be referred to collectively herein as "the defendants." The defendant Carla Weber has not joined in Dose's and Hinman's motions.

[2]The Government docketed its resistance separately under each of Dose's and
(continued...)

2

Defendant Hinman filed a reply to the government's resistance, and the government in turn filed a response to Hinman's reply.

Defendants' motions to dismiss were referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). The court held telephonic oral arguments on the current motions on April 14, 2005. On April 22, 2005, Judge Zoss filed a Report and Recommendation in which he recommends that defendants motions to dismiss be denied. Both defendants filed objections to Judge Zoss's Report and Recommendation and the government then filed a response to defendants' objections.

On May 6, 2005, defendant Hinman filed a new motion to dismiss Counts 2 through 5 of the Second Superseding Indictment (Dkt. #127). In his motion, defendant Hinman contends that Judge Zoss failed to address the issue of whether Counts 2 through 5 of the Second Superseding Indictment should be dismissed for failure to state an offense. Judge Zoss issued a second Report and Recommendation in which he found that the issue had been decided in his prior Report and Recommendation where he concluded the false statement counts properly alleged violations of 18 U.S.C. §§ 1001 and 1035. Nonetheless, Judge Zoss restated his prior discussion and findings on this issue. Defendant Hinman subsequently filed objections to Judge Zoss's second Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendants' pending motions to dismiss.

---

[2](...continued)
Hinman's names, *see* Doc. Nos. 116 and 117, but there is only one document.

### B. Factual Background

In a prior Report and Recommendation in this case, Judge Zoss made the following findings of fact regarding this case:

> The charges against the defendants arise from an incident that occurred in June 1999, at Indian Hills Nursing and Rehabilitation Center in Sioux City, Iowa ("Indian Hills"), a facility owned and operated by Care Initiatives, Inc. At that time, Anna Dose was employed by Care Initiatives as a consulting nurse for the company's nursing homes in western Iowa, including Indian Hills. Carla Weber was employed as Nurse Manager for the south side of the Indian Hills facility. Larry Hinman was employed by Care Initiatives as a regional director. His responsibilities included overseeing the management and operations of various nursing homes, including Indian Hills.
>
> Other individuals with knowledge about the incident in question include Scott Frank, Administrator of Indian Hills; Missy Kolar, Nurse Manager for the north side of the Indian Hills facility; Becky Medbourne, a nurse at the facility; and nurses' aides Becky Rodgers and Toni Ohl. The facility's Director of Nursing, Sue Harder, was out of the facility in training at the time of the incident in question.
>
> Indian Hills received Medicare and Medicaid funds in connection with its care of beneficiaries of those federal health care programs. To be certified to receive funding under Medicare and Medicaid, Indian Hills was subjected annually to an unannounced quality assurance inspection (called a "survey"). The purpose of the survey, in part, was to ensure that the residents of Indian Hills were being cared for properly. One such survey was conducted in May 1999, by the Iowa Department of Inspections and Appeals ("DIA"), operating as an agent of the federal Health Care Financing Administration ("HCFA"), the executive branch agency that makes the certification determination. During its May 1999 survey of Indian Hills, DIA identified at least one deficiency

4

that required additional action. Specifically, DIA determined the facility was not providing its residents with adequate supervision and assistance devices to prevent accidents. Indian Hills was required to submit a proposed plan to correct the deficiency, and then to undergo a revisit to verify that the deficiency had been corrected.

Sometime after the May 1999 survey, but before the revisit, a resident of Indian Hills (the "Resident") fell from a gerichair (similar to a wheelchair) and was seriously injured. The Resident required stitches to close a wound on the Resident's face, and other medical attention.

From June 23 to 25, 1999, DIA inspector Michael Streepy conducted the revisit. Upon his arrival at Indian Hills, Streepy requested a list of all residents who had fallen since the May survey was concluded. The list was prepared by one or more Indian Hills employees, possibly including Carla Weber. The Resident's name was omitted from the list. The charges in the Superseding Indictment relate to that omission, and to other actions the Government alleges the defendants took to prevent Streepy from finding out about the Resident's fall. In brief, the Government generally alleges the defendants conspired to commit health care fraud, to make false statements or conceal material facts related to a health care benefit program, to make false statements or conceal material facts within the jurisdiction of the HCFA, to obstruct a federal auditor in the performance of official duties relating to an entity receiving in excess of $100,000 from the United States during a one-year period, and to defraud the HCFA and the United States. (*See* Doc. No. 18)

Report and Recommendation (Dkt. #88) at pp. 3-4.

Before turning to a discussion of defendants' objections, the court will review the relevant portions of the Second Superceding Indictment. Counts Two through Five incorporate by reference the following allegations contained in Count One:

1. At all times relevant to this indictment:

5

A. Care Initiatives Inc. ("Care Initiatives") was a corporation that operated nursing homes in Iowa. Care Initiatives' main office was located in West Des Moines, Iowa.

B. Indian Hills Nursing and Rehab Center ("Indian Hills"), located in Sioux City, Iowa, was among the nursing homes operated by Care Initiatives. Indian Hills received Medicare and Medicaid funds for health care items, benefits and services it provided to the beneficiaries of these health care benefit programs. Medicare and Medicaid were health care benefit programs affecting commerce as defined in Title 18, United States Code, § 24(b). Care Initiatives and Indian Hills received in excess of $100,000 in funds from each of these programs during a continuous one-year period that included June 1999.

C. The Health Care Financing Administration ("HCFA") was an agency of the United States Department of Health and Human Services ("DHHS"). HCFA and DHHS were a part of the executive branch of the United States government. HCFA's purpose was, in part, to determine whether nursing facilities should be certified and receive funds under Medicare and Medicaid, and to monitor and ensure the quality of care given to residents of Medicare and Medicaid certified entities.

D. The Iowa Department of Inspections and Appeals ("DIA") operated as an agent of HCFA, and conducted inspections ("surveys") of Medicare and Medicaid certified entities, including Indian Hills, for and on behalf of HCFA. The DIA surveys were used by HCFA to determine whether nursing home facilities should be certified and receive funds under Medicare and Medicaid. The DIA surveys were also used by HCFA to monitor and ensure the quality of care given to residents of Medicare and Medicaid certified entities. At the conclusion of a survey, DIA informed the surveyed facility of any deficiencies in the quality of care identified during the

6

survey.  When deficiencies were identified by DIA in an initial visit, DIA would conduct a revisit of the facility to determine whether the facility had adequately addressed the deficiency. Deficiencies found on the revisit were reported to HCFA. Deficiencies, depending on the type and severity, could result in monetary penalties and other sanctions against a facility, including up to termination from the Medicare and Medicaid programs.

   E. Defendant LARRY HINMAN was employed by Care Initiatives as a Divisional Director.  Defendant HINMAN's duties included supervising the administrators and monitoring DIA surveys at the Care Initiatives nursing homes in his region.  Indian Hills was among the nursing homes for which defendant HINMAN was responsible.

   F. Defendant ANNA DOSE, also known as Ann Dose, was employed by Care Initiatives as a nurse consultant. Defendant DOSE was assigned to work with certain Care Initiatives facilities, including Indian Hills.  Among other things, defendant DOSE was responsible for preparing these facilities for DIA surveys.  Defendant DOSE closely monitored the progress of DIA surveyors as they conducted their surveys.  In 1998, defendant DOSE was directed by her supervisor to lower the number of deficiencies in the facilities that she worked with, including the number of deficiencies at Indian Hills.  Defendant DOSE's supervisor believed that Indian Hills had higher deficiency numbers than the state average.

   G. Defendant CARLA WEBER was employed by Care Initiatives as a supervisory nurse at Indian Hills.  As a supervisory nurse, defendant WEBER was responsible for, among other things, supervising nurses and other Care Initiatives employees in the performance of their duties, and, at times, was responsible for providing requested information to DIA surveyors.

   . . .

7

## THE MANNER AND MEANS OF THE CONSPIRACY

3.     The conspiracy was accomplished in the following ways, among others:

A.     In or about May 1999, DIA conducted a survey at Indian Hills on behalf of HCFA.  During the survey, DIA identified a number of deficiencies.  Among other things, DIA found that Indian Hills staff was not properly ensuring that each resident received adequate supervision and assistance devices to prevent accidents.  This was a significant deficiency because it involved an injury to a resident.  At the conclusion of the survey, DIA notified Indian Hills of the deficiencies.

B.     On or about June 14, 1999, an 84-year-old Indian Hills resident with a history and high risk of falling ("the injured Indian Hills resident") fell from a gerichair – a chair similar to a wheelchair – and was seriously injured.  The injured Indian Hills resident required immediate medical attention, including stitches to close a wound on her face.  Soon thereafter, the co-conspirators concluded that the injured Indian Hills resident's fall and injury was of the same type that had resulted in DIA's May 1999 determination that Indian Hills staff was not properly ensuring that each resident received adequate supervision and assistance devices to prevent accidents.

C.     Beginning on approximately June 23, 1999, and continuing through approximately June 25, 1999, DIA, on behalf of HCFA, revisited Indian Hills to determine if, among other things, Indian Hills had remedied the significant deficiency found by DIA in May 1999.  DIA sought to determine if Indian Hills had achieved and maintained compliance with its obligation to properly ensure that each resident received adequate supervision and assistance devices to prevent accidents.

D.     During the DIA revisit, defendants LARRY

8

HINMAN, ANNA DOSE and CARLA WEBER, and others known and unknown to the Grand Jury, concealed and attempted to conceal the injured Indian Hills resident's fall and injury from the DIA surveyor. In particular, in response to the DIA surveyor's request for a list of the names of Indian Hills residents who had fallen or been injured since the May 1999 survey, the co-conspirators created and provided, and caused to be created and provided, a list from which they deliberately excluded the name of the injured Indian Hills resident. The co-conspirators also caused the injured Indian Hills resident to be physically turned in her room in an effort to prevent the DIA surveyor from seeing the injured Indian Hills resident's injury. The co-conspirators also caused the injured Indian Hills resident's medical chart to be hidden from the DIA surveyor in an effort to prevent the DIA surveyor from learning of the injured Indian Hills resident's fall and injury.

OVERT ACTS

4.     In furtherance of the conspiracy and to effect the objects of the conspiracy, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, committed the following overt acts, among others, in the Northern District of Iowa:

        A.     Sometime between about June 14, 1999, and about June 25, 1999, defendants LARRY HINMAN and ANNA DOSE discussed the injured Indian Hills resident's fall and injury, and the effect that the fall and injury could have on DIA's conclusions when the DIA surveyor revisited Indian Hills. During that discussion, defendants HINMAN and DOSE agreed to take steps to conceal the injured Indian Hills resident's fall and injury from the DIA surveyor.

        B.     Sometime between about June 14, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER discussed the injured Indian Hills resident's fall and the effect the fall and injury could have on DIA's conclusions when DIA revisited Indian Hills.

9

C. Sometime between about June 23, 1999, and about June 25, 1999, defendant LARRY HINMAN called the administrator at Indian Hills and told the administrator that the DIA surveyor should not be given information regarding the injured Indian Hills resident's injury.

D. Sometime between about June 23, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER agreed to withhold the injured Indian Hills resident's name from the DIA surveyor in an effort to conceal the injured Indian Hills resident's fall.

E. Sometime between about June 23, 1999, and about June 25, 1999, following the DIA surveyor's request for a list of residents who had fallen or been injured since the May 1999 survey, defendant CARLA WEBER prepared the list, but intentionally omitted the injured Indian Hills resident's name from the list.

F. Sometime between about June 23, 1999, and about June 25, 1999, defendant CARLA WEBER caused the fraudulently incomplete list of residents who had fallen and suffered an injury since the May 1999 survey to be provided to the DIA surveyor.

G. Sometime between about June 23, 1999, and about June 25, 1999, defendant LARRY HINMAN spoke with defendant CARLA WEBER and instructed her not to point the surveyor to the injured Indian Hills resident, and to keep the surveyor as far away from the injured Indian Hills resident as possible.

H. Sometime between about June 23, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER attempted to conceal the injured Indian Hills resident's injury from the DIA surveyor by instructing subordinates to physically place the injured Indian Hills resident in her room so that the injured Indian Hills resident's

10

injury would not be visible to the DIA surveyor as he completed his revisit.

I.     Sometime between about June 23, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER attempted to conceal the injured Indian Hills resident's injury from the DIA surveyor by hiding and instructing others to hide the injured Indian Hills resident's medical chart from the DIA surveyor as the DIA surveyor completed his survey.

J.     On or about June 25, 1999, after learning that the DIA surveyor had discovered the injured Indian Hills resident's injury despite their efforts to fraudulently conceal it, defendants ANNA DOSE and CARLA WEBER met and decided what they would tell the surveyor about their failure to disclose the injured Indian Hills resident's injury on the list of injuries provided to the surveyor.

K.     On or about June 25, 1999, defendant CARLA WEBER, in the presence of defendant ANNA DOSE, told the DIA surveyor that she (defendant WEBER) had left the injured Indian Hills resident's name off of the list of residents who fell or were injured in an effort to protect Indian Hills.  At this meeting, defendants WEBER and DOSE intentionally hid from the surveyor that defendants DOSE and HINMAN were also involved in the scheme to hide the injured Indian Hills resident's injury.

Second Superceding Indictment, Doc. No. 94, at ¶¶ 1, 1A-1G, 3A-3D, and 4A-4K.

In Counts Two and Three, the defendants are charged with violating Title 18, United States Code, section 1035(a).[3] Count Two "repeats, realleges, and incorporates by

---

[3]Section 1035 of Title 18 provides as follows:

(a)     Whoever, in any matter involving a health care

(continued…)

Case 5:04-cr-04082-MWB     Document 151     Filed 07/28/05     Page 11 of 41

reference" each of the allegations from Count One that are quoted above. Count Two then charges the defendants as follows:

> 6.    Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, in a matter involving the Medicare and Medicaid health care benefit programs, and in connection with the delivery of and payment for health care items, benefits and services, knowingly and willfully concealed and covered up, and caused to be concealed and covered up,

---

[3](…continued)
> benefit program, knowingly and willfully –
>> (1)  falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or
>> (2)  makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.
>
> (b)    As used in this section, the term "health care benefit program" has the meaning given such term in section 24(b) of this title.

18 U.S.C. § 1035. Section 24(b) of Title 18 defines "health care benefit program" as

> any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b).

12

by trick, scheme, and device, a material fact, namely that the injured Indian Hills resident had fallen and been injured at Indian Hills after DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1035(a)(1) and 2(a) & (b).

Second Superceding Indictment, Doc. No. 94, at ¶ 6.

Count Three similarly incorporates by reference the quoted allegations from Count One. Count Three then charges the defendants as follows:

8.    Between on or about June 23 and on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, in a matter involving the Medicare and Medicaid health care benefit programs, and in connection with the delivery of and payment for health care items, benefits and services, did:

A.    knowingly and willfully make, and cause[] to be made, a materially false, fictitious, and fraudulent statement and representation, in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN, falsely, fictitiously, and fraudulently represented to the DIA surveyor that she had informed the DIA surveyor of all relevant Indian Hills residents who had fallen or suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, defendant WEBER had failed to inform the DIA surveyor that the injured Indian Hills resident had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey; and

B.    knowingly and willfully make and use, and cause to be made and used, a material false writing and document, in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN, created and presented, and caused to be created and presented, a list to the DIA surveyor which purported to

13

contain all of the relevant names of Indian Hills residents who had fallen and suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, the document was materially false, fictitious and fraudulent, in that the document omitted the name of the injured Indian Hills resident who had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1035(a)(2) and (2)(a) & (b).

Second Superceding Indictment, Doc. No. 94, at ¶ 8.

Counts Four and Five charge the defendants with violating 18 U.S.C. § 1001(a).[4]

Count Four realleges and incorporates by reference the allegations from Count One quoted above, and then charges the defendants as follows:

10.    Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the

---

[4] Section 1001(a) of Title 18 provides as follows:

(a)    Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully --

(1)    falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2)  makes any materially false, fictitious, or fraudulent statement or representation; or

(3)   makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001(a).

Case 5:04-cr-04082-MWB    Document 151    Filed 07/28/05    Page 14 of 41

Northern District of Iowa, in a matter within the jurisdiction of HCFA, DHHS and the executive branch of the United States government, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER knowingly and willfully concealed and covered up, and caused to be concealed and covered up, by trick, scheme, and device, a material fact from the DIA surveyor, namely that the injured Indian Hills resident had fallen and been injured at Indian Hills after DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1001(a)(1) and 2(a) & (b).

Second Superceding Indictment, Doc. No. 94, at ¶10.

Count Five also realleges and incorporates by reference the above-quoted allegations from Count One, and then charges the defendants as follows:

12. Between on or about June 23 and on or about June 25, 1999, within the Northern District of Iowa, in a matter within the jurisdiction of HCFA, DHHS and the executive branch of the United States government, defendants CARLA WEBER, LARRY HINMAN and ANNA DOSE, did:

A. knowingly and willfully make, and cause to be made, a materially false, fictitious and fraudulent statement and representation in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN falsely, fictitiously, and fraudulently represented to the DIA surveyor that they [sic] had informed the DIA surveyor of all relevant Indian Hills residents who had fallen or suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, defendant WEBER had failed to inform the DIA surveyor that the injured Indian Hills resident had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey; and

B. knowingly and willfully make and use, and cause

15

to be made and used, a material false writing and document, in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN, created and presented, and caused to be created and presented, a list to the DIA surveyor which purported to contain all of the relevant names of Indian Hills residents who had fallen and suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, the document was materially false, fictitious and fraudulent, in that the document omitted the name of the injured Indian Hills resident who had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1001(a)(2) & (a)(3) and (2)(a) & (b).

Second Superceding Indictment, Doc. No. 94, at ¶12.

Finally, in Count Six, after again incorporating by reference the allegations from Count One, the Government charges the defendants as follows:

14.    Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, with intent to deceive the United States, endeavored to influence, obstruct, and impede a Federal auditor, namely a DIA surveyor, in the performance of official duties relating to an entity, namely Indian Hills, that received in excess of $100,000, directly or indirectly, from the United States in a one year period that included June 1999, under a contract, subcontract, grant, and cooperative agreement.

This in violation of Title 18, United States Code, Sections 1516 and 2(a) & (b).

Second Superceding Indictment, Doc. No. 94, at ¶14.

16

## II.  LEGAL ANALYSIS

### A.  Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1).  Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

FED. R. CIV. P. 72(b).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required.  *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*).  As noted above, defendants have filed objections to Judge Zoss's Report and Recommendations.

17

The court, therefore, undertakes the necessary review of Judge Zoss's recommended dispositions of defendants' motions.

## B. Objections To Report and Recommendations

### 1. Multiplicity of Counts Two and Three

Both defendants Dose and Hinman have filed objections to that portion of Judge Zoss's Report and Recommendation in which Judge Zoss recommended that Counts Two and Three of the Second Superseding Indictment were not multiplicitous, and that defendants' respective motions should therefore be denied as to Counts Two and Three.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. CONST. amend. V. The United States Supreme Court has observed that:

> The Double Jeopardy Clause embodies three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense."

*Grady v. Corbin*, 495 U.S. 508, 515 (1990) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnotes omitted)). Here, the issue concerns the last of these three protections-the protection against multiplicitous indictments. "An indictment is multiplicitous if it charges a single offense in multiple counts." *United States v. Roy*, 408 F.3d 484, 490 (8th Cir. 2005); *see United States v. Chipps*, 410 F.3d 438, 447 (8th Cir. 2005); *United States v. Christner*, 66 F.3d 922, 927 (8th Cir. 1995); *United States v. Rimell*, 21 F.3d 281, 287 (8th Cir.), *cert. denied*, 115 S. Ct. 453 (1994). As the Eighth Circuit Court of Appeals explained in *Chipps*: "The main difficulty with such an indictment is that the jury can convict the defendant on both counts, subjecting the

18

defendant to two punishments for the same crime in violation of the double-jeopardy clause of the fifth amendment." *Chipps*, 410 F.3d at 447. In order to show that an indictment is multiplicitous, "'a defendant must show that the two offenses charged are in law and fact the same offense.'" *Roy*, 408 F.3d at 490 (quoting *United States v. Bennett*, 44 F.3d 1364, 1368 (8th Cir. 1995)); *accord United States v. Ervasti*, 201 F.3d 1029, 1039 (8th Cir. 2000). The court of appeals instructed in *Christner* that:

> "First, a court must ask whether Congress 'intended that each violation be a separate offense.' . . . If it did not, there is no statutory basis for the two prosecutions, and the double jeopardy inquiry is at an end. . . . Second, if Congress intended separate prosecutions, a court must then determine whether the relevant offenses constitute the 'same offense' within the meaning of the Double Jeopardy Clause."
>
> *Bennett*, 44 F.3d at 1373 (citations omitted). As to this second inquiry, the court explained "[t]he double jeopardy bar applies only to prosecutions or convictions which cannot survive the 'same elements' test." *Id.* As stated above, "where the same act or transaction constitutes a violation of two distinct statutory provisions," the test "is whether each provision requires proof of a fact which the other does not." *Blockburger [v. United States]*, 284 U.S. [299] at 304, 52 S. Ct. [180] at 182 [1932].

*Christner*, 66 F.3d at 928.

Upon careful consideration of the language and structure of § 1035, the court concludes that Congress intended that an act of intentionally concealing a material fact and the act of knowingly making a false statement in connection with the delivery of health care benefits constitute two separate offenses under the statute where, as in this case, the concealment and the statement are separate acts. The court notes that Congress saw fit to separate the crime of intentionally concealing a material fact from the crime of knowingly

19

making a false statement in connection with the delivery of health care benefits by placing each crime in separate subsections of 18 U.S.C. § 1035. The former crime is contained in 18 U.S.C. § 1035(a)(1) while the later is contained in 18 U.S.C. § 1035(a)(2). In separating the crime of intentionally concealing a material fact from the crime of knowingly making a false statement in connection with the delivery of health care benefits, Congress expressed its intention to treat each violation as a separate offense. Thus, the statutory intent test is met. Moreover, the court further concludes that the same elements test is also met. By its very terms, § 1035(a)(1) requires that an individual falsify, conceal or cover up by any trick, scheme, or device a material fact. Section 1035(a)(2) incorporates no such element. Correspondingly, § 1035(a)(2) requires that the accused make a "materially false, fictitious, or fraudulent" statement or entry "in connection with the delivery of or payment for health care benefits, items, or services", whereas § 1035(a)(1) contains no such requirement. Because each statutory provision "requires proof of an additional fact which the other does not," charging an individual under both sections is not multiplicitous. Therefore, the objections to this portion of Judge Zoss's Report and Recommendation are denied.

### 2. *Multiplicity of Counts Four and Five*

Defendants Dose and Hinman have filed near identical objections to that portion of Judge Zoss's Report and Recommendation in which Judge Zoss recommended that Counts Four and Five of the Second Superseding Indictment were not multiplicitous, and that defendants' respective motions should therefore be denied as to Counts Four and Five. In Count Four, defendants are charged with violating 18 U.S.C. § 1001(a)(1), which makes it a crime, in connection with "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," to knowingly and willfully falsify, conceal, or cover up a material fact "by any trick, scheme, or device,"

20

18 U.S.C. § 1001(a)(1), while in Count Five, they are charged with violating subsections (a)(2) and (a)(3) of section 1001, which make it a crime, in connection with "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," to knowingly and willfully make "any materially false, fictitious, or fraudulent statement or representation," or to make or use "any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1001(a)(2) & (3).

The analysis discussed above with respect to § 1035 applies with equal strength concerning § 1001. The court concludes that, in § 1001, Congress intended that the act of concealment by trick, scheme or device, as articulated in § 1001(a)(1), constitute a separate and distinct offense from the act of making a false statement or representation, orally or in writing, as articulated in §§ 1001(a)(2) and 1001(a)(3). By its very terms, § 1001(a)(1) requires that an individual falsify, conceal or cover up by any trick, scheme, or device a material fact. Section 1001(a)(2) and 1001(a)(3) incorporate no such element. Correspondingly, §1001(a)(2) requires that the accused make a "materially false, fictitious, or fraudulent statement of representation" and § 1001(a)(3) requires that the accused make or use "any false writing or document knowing the same to contain materially false, fictitious, or fraudulent statement or entry", whereas § 1001(a)(1) contains no such requirement. Because each statutory provision "requires proof of an additional fact which the other does not," charging an individual under both § 1001(a)(1) and § 1001(a)(2) or 1001(a)(3) is not multiplicitous. Therefore, the objections to this portion of Judge Zoss's Report and Recommendation are also denied.

### 3.    *Multiplicity of the § 1001 and the § 1035 Counts*

Defendants have also filed objections to that portion of Judge Zoss's Report and Recommendation in which Judge Zoss recommended that the counts charging violations

of § 1035, Counts Two and Three, and those charging violations of § 1001, Counts Four and Five, were not multiplicitous, and that portion of defendants' respective motions should therefore be denied. Judge Zoss found that, under *Blockburger*, the court must focus on the statutory elements of the offense, and not on the particular facts of the case. Applying that test, Judge Zoss concluded that a person could violate § 1035 in connection with the delivery of health care services under a private health care benefit program and not concurrently violate § 1001 and that, conversely, a person could violate § 1001 in connection with any number of matters that fall within the jurisdiction of the federal government but have nothing to do with a health care benefit program. Thus, Judge Zoss concluded that the same elements test is met. Judge Zoss further concluded that charging the defendants under both statutes is permissible because Congress expressed its intent clearly that conduct may be punishable under both § 1001 and § 1035. Defendants take issue with each of these conclusions. The court will consider each objection in turn.

Defendants argue that the *Blockburger* test is to be applied by looking beyond the statutory language and looking at the underlying facts or averments in the indictment. Defendants contend that §§ 1035 and 1001 are cumulative or multiplicitous because they require proof of the same facts since under the facts of this case, the health care benefits programs for purposes of § 1035 are Medicare and Medicaid and that those programs are under the government's jurisdiction for the purposes of § 1001. Thus, defendants contend here that the proving a violation of § 1035 must as a matter of law encompasses a violation of § 1001. In support of their position, defendants point out that the Supreme Court, in *Whalen v. United States*, 445 U.S. 684, 694-95 (1980), applied *Blockburger* by considering the nature of the underlying felony in a felony-murder indictment rather than based only on the elements of the statutes at issue. In *Whalen*, the Court found that rape and killing in the course of a rape, expressly defined as a species of felony murder under

Case 5:04-cr-04082-MWB     Document 151     Filed 07/28/05     Page 22 of 41

the laws of the District of Columbia, were not separate offenses under the *Blockburger* test, because rape was a lesser included offense of killing in the course of a rape. *Id.*

The United States Supreme Court, however, has indicated in a decision handed down since *Whalen* that the proper focus is on the statutory elements of each offense. In *Illinois v. Vitale*, 447 U.S. 410 (1980), a decision handed down two months after the *Whalen* decision, the Court observed:

> We recognized that the *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial. Thus we stated that if "'each statute requires proof of an additional fact which the other does not,' *Morey v. Commonwealth*, 108 Mass. 433, 434 (1871)," the offenses are not the same under the *Blockburger* test.

*Vitale*, 447 U.S. at 416. The Court's conclusion in *Vitale*, is in keeping with its decision in *Iannelli v. United States*, 420 U.S. 770, 785 (1975), in which the Court stated: "[T]he Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Id.* at 785, n.17.

The Court of Appeals for the Eighth Circuit has spoken directly to this issue since the *Whalen* decision was handed down. In *Flittie v. Solem*, 775 F.2d 993 (8th Cir. 1985), *cert. denied*, 475 U.S. 1025 (1986), the court of appeals observed:

> Two offenses are not the same if one requires proof of a fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932). This test focuses on the statutory elements of the offenses, rather than the evidence presented at trial, *Illinois v. Vitale*, 447 U.S. 410, 416, 100 S. Ct. 2260, 2265, 65 L. Ed.2d 228 (1980), and applies "notwithstanding a substantial overlap in

23

the proof offered to establish the crimes." *Iannelli v. United States*, 420 U.S. 770, 785 n.17, 95 S. Ct. 1284, 1293 n.17, 43 L. Ed.2d 616 (1975).

*Flittie*, 775 F.2d at 937.[5]  A number of other federal circuit courts of appeal have held that the appropriate test to be applied under *Blockburger* requires a court to look solely to the statutory elements of the offense.  *See United States v. Odutayo*, 406 F.3d 386, 392 (5th

_____

[5]In *Bennett*, another post-*Whalen* decision, the Eighth Circuit Court of Appeals recognized that:

> [C]ourts are split on whether the test is to be applied by looking solely to the statutory elements of the offense, or by going beyond the statute and looking at the underlying facts or averments in the indictment.  *Compare United States v. Adams*, 1 F.3d 1566, 1574 (11th Cir. 1993) ("the *Blockburger* test is to be applied to the statutory elements underlying each indictment, or count, not to the averments that go beyond the statutory elements"), *cert. denied*, 510 U.S. 1198, 114 S. Ct. 1310, 127 L. Ed. 2d 660 (1994) with *United States v. Sampol*, 636 F.2d 621, 652 (D.C. Cir. 1980) ("the prohibition in the Constitution against placing an accused twice in jeopardy 'for the same offense' is directed at the actual 'offense' with which he is charged and not only at the violated statutes").  There is also disagreement on this issue among members of the Supreme Court.  *See Dixon*, 509 U.S. at 693-705, 113 S. Ct. at 2855-61 (Scalia, J., joined by Kennedy, J.); *id*. at 712- 20, 113 S. Ct. at 2865-69 (Rehnquist, C.J., joined by O'Connor, J., and Thomas, J.); *id*. at 727-28, 113 S. Ct. at 2873-74 (White, J., joined by Stevens, J.); and *id*. at 759-80, 113 S. Ct. at 2890-91 (Souter, J., joined by Stevens, J.).

*Bennett*, 44 F.3d at 1374.  The Eighth Circuit Court of Appeals, however, concluded in *Bennett* that it need not reach the issue of what is the appropriate test to apply under *Blockburger*, "because whether we look at the statutory elements or at the underlying facts contained within the indictments, we find no double jeopardy violation in this case."  *Id.*

24

Cir. (5th Cir. 2005) (instructing that "[t]he application of the *Blockburger* test does not involve the detailed examination of the case's factual circumstances; rather, our inquiry focuses on the elements of the statutory offense."); *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005) (noting that "[t]he *Blockburger* test focuses on the statutory elements of each offense, not on the actual evidence presented at trial."); *United States v. Lankford*, 196 F.3d 563, 577 (5th Cir. 1999) ("In applying [the *Blockburger*] test, we examine not the particular circumstances involved in the case before us, but the statutory elements."), *cert. denied*, 529 U.S. 1119 (2000); *United States v. Soape*, 169 F.3d 257, 265 (5th Cir.) ("The focus in determining the issue of multiplicity is on the statutory elements of the offenses, not on their application to the facts of the specific case before the court."), *cert. denied*, 527 U.S. 1011 (1999); *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994) ("Determining whether statutory offenses are separate for double jeopardy purposes involves parsing the statutes apart from the facts of any particular case."); *Adams*, 1 F.3d at 1574 (holding that "the *Blockburger* test is to be applied to the statutory elements underlying each indictment, or count, not to the averments that go beyond the statutory elements."); *see also United States v. Fornia-Castillo*, 408 F.3d 52, 70 (1st Cir. 2005) (holding that the *Blockburger* test focuses on statutory elements of each offense ); *United States v. Moore*, 43 F.3d 568 (11th Cir. 1995) (noting that under *Blockburger*, "the proper focus is on the statutory elements of the two crimes."), *cert. denied*, 516 U.S. 879 (1995); *United States v. Colon-Osorio*, 10 F.3d 41, 43 (1st Cir. 1993) ("The *Blockburger* test focuses on the statutory elements of each offense."). Therefore, the court concludes that Judge Zoss correctly focused on the statutory elements of each offense and not on the evidence which will be presented at trial to prove the offenses.  The court further concludes that the same elements test is met because in order to prove a violation of § 1001, the government must prove that the act was done in a

25

matter that is within the jurisdiction of the federal government while in order to prove a violation of § 1035, the government must prove that the act was done in a matter involving a health care benefit program, and in connection with delivery of or payment for health care benefits, items, or services. Therefore, the objections to this portion of Judge Zoss's Report and Recommendation are also denied.

Defendants have also objected to that portion of Judge Zoss's Report and Recommendation in which he found that the legislative history reveals Congress's intent that conduct may be punishable under both § 1001 and § 1035. In reaching his conclusion, Judge Zoss relied on the United States Supreme Court's decision in *United States v. Woodward*, 469 U.S. 105 (1985). In *Woodward*, the defendant was convicted of the offenses of failing to file a United States Customs Report of International Transportation of Currency or Monetary Instruments ("CMIR") as required by regulations promulgated pursuant to 31 U.S.C. §§ 1058 and 1101 and making false statements to an agency of the United States in violation of 18 U.S.C. § 1001. Both of the charges stemmed from a single incident where the defendant was found to have falsely stated to customs agents that he was not carrying in excess of $5000 in currency into the United States. In appealing his conviction, the defendant contended that he could not be charged with both the false statement offense and the violation of the CMIR filing requirement.

The Court concluded that the defendant's conduct could be punished under both 18 U.S.C. § 1001 and 31 U.S.C. §§ 1058 and 1101. *Id*. at 110. In reaching this conclusion, the Court applied the rule of statutory construction contained in *Blockburger*, observing:

> proof of a currency reporting violation does *not* necessarily include proof of a false statement offense. Section 1001 proscribes the nondisclosure of a material fact only if the fact is "conceal[ed] by . . . any trick, scheme, or device." (Emphasis added.) A person could, without employing a

Case 5:04-cr-04082-MWB     Document 151     Filed 07/28/05     Page 26 of 41

> "*trick*, *scheme*, or *device*," simply and willfully fail to file a
> currency disclosure report. A traveler who enters the country
> and passes through Customs prepared to answer questions
> truthfully, but is never asked whether he is carrying over
> $5,000 in currency, might nonetheless be subject to conviction
> under 31 U.S.C. § 1058 for willfully transporting money
> without filing the required currency report. However, because
> he did not conceal a material fact by means of a "trick, scheme
> or device," (and did not make any false statement) his conduct
> would not fall within 18 U.S.C. § 1001.

*Id.* at 108 (footnotes omitted). In addition to its application of the *Blockburger* rule, the
Court looked to two other factors in reaching its conclusion that the defendant's conduct
could be punished under both 18 U.S.C. § 1001 and 31 U.S.C. §§ 1058 and 1101. First,
"[t]here is no evidence . . . that Congress did not intend to allow separate punishment for
the two different offenses." *Id.* Second, the Court found that the statutes "'are directed
to separate evils.'" *Id.* at 109 (quoting *Albernaz v. United States*, 450 U.S. 333, 340, 343,
(1981)). In this regard, the Court wrote:

> The currency reporting statute was enacted to develop records
> that would "have a high degree of usefulness in criminal, tax,
> or regulatory investigations." 31 U.S.C. § 1051. The false
> statement statute, on the other hand, was designed "to protect
> the authorized functions of governmental departments and
> agencies from the perversion which might result from the
> deceptive practices described." *United States v. Gilliland*, 312
> U.S. 86, 93, 61 S. Ct. 518, [522] 85 L. Ed. 598 (1941).

*Id.*

Judge Zoss found that application of the factors delineated in *Woodward* to the facts
of this case compelled the conclusion that defendants may be prosecuted under both under
both § 1001 and § 1035. The court concurs with Judge Zoss's assessment. Section 1001,
which was first enacted over 100 years ago, in 1863, "was designed 'to protect the

authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.'" *Woodward*, 469 U.S. at 109 (quoting *United States v. Gilliland*, 312 U.S. 86, 93 (1941)); *see also United States v. Bramblett*, 348 U.S. 503, 504, 506 n.2 (1955) (noting that § 1001 was passed "in the wake of a spate of frauds upon the government" and that its initial design was to proscribe false statements if they were made with the "'intent of cheating and swindling or defrauding the Government of the United States' as well as if made for the purposes of obtaining payment of a false claim."); *United States v. Baker*, 626 F.2d 512, 515 (5th Cir. 1980) (observing that § 1001 "is designed to protect federal funds and functions from fraudulent interference."); *Paternostro v. United States*, 311 F.2d 298, 302 (5th Cir. 1962) (noting that § 1001's "purpose was to protect the Government from the affirmative, aggressive and voluntary actions of persons who take the initiative; and to protect the Government from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions."). In contrast, § 1035 was added to Title 18 as part of the Health Insurance Portability and Accountability Act of 1996, *See* H.R. Rep. 104-496(I) (1996), and its purpose is to "combat waste, fraud, and abuse in health insurance and health care delivery." Introduction to H.R. Conf. Rep. 104-736, at *1 (1996), 1996 WL 579893 (Leg. Hist.), *reprinted in* 1996 U.S.C.C.A.N. 1990. Moreover, it is clear from the legislative history of § 1035 that Congress was well aware of the existence of section 1001 at the time of its passage. This is best exemplified by the fact that Congress included both § 1001 and § 1035 in its statutory definition of a "Federal health care offense." *See* 18 U.S.C. § 24(a)(1)-(2). There is no evidence in § 1001 and § 1035 that Congress did not intend to allow separate punishments for the two different offenses. Because it is clear that Congress was well aware of § 1001 at the time of § 1035's passage but did not suggest in anyway that the two statutes could not be applied

28

together, the court cannot assume that Congress was unaware that it had created two different offenses permitting multiple punishments for the same conduct. Therefore, the court concludes that Congress intended that defendants' conduct be punishable under both §1001 and § 1035, and the objections to this portion of Judge Zoss's Report and Recommendation are also denied.

### 4. The Sufficiency of the Second Superceding Indictment

Defendant Hinman has also filed objections to those portions of Judge Zoss's Report and Recommendations in which Judge Zoss recommended that Counts Two through Six of the Second Superseding Indictment are sufficient.

### a. Standards for dismissal of an indictment

The Eighth Circuit Court of Appeals has considered the minimum requirements for a sufficient indictment on numerous occasions, instructing that:

> Rule 7(c)(1) of the Federal Rules of Criminal Procedure states that "[t]he indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the *offense* charged." (emphasis added). The indictment "shall state the *statute, rule, regulation* or other provision of law which the defendant is alleged therein to have *violated*." *Id.* (emphasis added). An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. *See United States v. Wessels*, 12 F.3d 746, 750 (8th Cir. 1993) (citing *United States v. Young*, 618 F.2d 1281, 1286 (8th Cir. 1980)).

*United States v. Carter*, 270 F.3d 731, 736 (8th Cir. 2001) (emphasis in the original); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient

29

if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."); *United States v. Springer*, 354 F.3d 772, 774 (8th Cir. 2004) ("An indictment charging the violation of such a statute will be upheld if 'the offense be described with sufficient clearness to show a violation of law, and to enable the accused to know the nature and cause of the accusation.'") (quoting *United States v. Behrman*, 258 U.S. 280, 288 (1922)), *cert. denied*, 124 S. Ct. 2866 (2004); *United States v. Olson*, 262 F.3d 795, 799 (8th Cir. 2001) ("To be sufficient, an indictment must 'contain[] the elements of the offense charged.' *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974); *see* FED. R. CRIM. P. 7(c)(1)."); *United States v. White*, 241 F.3d 1015, 1021 (8th Cir. 2001) ("We will consider an indictment sufficient 'if it fairly informs the accused of the charges against him and allows him to plead double jeopardy as a bar to a future prosecution.'") (quoting *United States v. Mallen*, 843 F.2d 1096, 1102 (8th Cir. 1988)).[6] Similarly,

---

[6] As the court also explained in *Carter*, "Although the sufficiency of an indictment is a jurisdictional issue which may be considered at any time, Fed. R. Crim. P. 12(b)(2), when an indictment is challenged for the first time after a verdict, it will be liberally construed in favor of sufficiency." *Carter*, 270 F.3d at 736. In those circumstances, "absent prejudice," the indictment will stand, "unless the indictment cannot, within reason, be construed to charge a crime." *Id.*; *Olson*, 262 F.3d at 799 (clarifying that "when the sufficiency of an indictment is challenged after jeopardy attaches, . . . we liberally construe the indictment, finding it sufficient 'unless it is so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted'") (quoting *United States v. Just*, 74 F.3d 902, 904 (8th Cir. 1996)); *White*, 241 F.3d at 1021 (explaining that "we apply a more deferential standard of review" when an indictment is not challenged until after jeopardy attaches, identifying that "more deferential standard" in essentially the same terms as are used in *Carter* and *Olson*). However, Hinman's challenge to the sufficiency of the indictment has been made prior to trial, so (continued...)

> Usage of a particular word or phrase in the indictment is not required as long as we can recognize a valid offense and the form of the allegation 'substantially states the element[s].' [*Mallen*, 843 F.2d at 1102.] In fact, we will find an indictment insufficient only if an "essential element 'of substance' is omitted." *Id.* (citation omitted).

*White*, 241 F.3d at 1021. Although no particular words or phrases are necessarily required, "[i]t is well-established in this circuit that citation of the statute, without more, does not cure the omission of an essential element of the charge because bare citation of the statute 'is of scant help in deciding whether the grand jury considered' the missing element in charging the defendant." *Olson*, 262 F.3d at 799 (quoting *United States v. Camp*, 541 F.2d 737, 740 (8th Cir. 1976), and also citing *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1988)).

### b.    *Analysis of the sufficiency of particular counts*

### i.    *Counts 2 through 5*

Defendant Hinman objects to Judge Zoss's recommendation that the court reject Hinman's argument that Counts 2 through 5 should be dismissed because they fail to allege that defendant Hinman "intended that any falsification or concealment would bear a relation or a purpose to some matter within the jurisdiction of any department or agency of the United States." Judge Zoss concluded that the reasoning in *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir. 1984) ("We are persuaded that no mental state is required with respect to federal involvement in order to establish a violation of section 1001."), *cert. denied*, 474 U.S. 925 (1985) and *United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir.

---

[6](...continued)

that the indictment is not entitled to either liberal construction or deference.

1990) (finding that "no doubt that Congress – through § 1001 – acted within its powers to criminalize the issuance of an intentionally false statement within the jurisdiction of a federal department or agency, regardless of the defendant's awareness that the statement will be so delivered"), *cert. denied*, 499 U.S. 924 (1991) was persuasive and found no scienter requirement with regard to the jurisdictional awareness of a false statement. Judge Zoss concluded that the only intent the government must prove is that the defendant had the intent to make the false statement and that by alleging defendant Hinman made a false statement, or caused a false statement to be made, the indictment fairly apprises him of the conduct the government alleges violated the statute. Therefore, Judge Zoss recommended defendant Hinman's motion to dismiss Counts 2 through 5 be denied.

In *United States v. Yermian*, 468 U.S. 63 (1984), the Supreme Court addressed the issue of a defendant's knowledge of the jurisdictional element of the false statements statute. Based on both the plain language of the statute and its legislative history, the Court decided that "proof of actual knowledge of federal agency jurisdiction is not required under § 1001." *Id.* at 75. The Court, however, specifically left open the question of whether some lesser standard of culpability must be read into the statute. *See id.* at 75 n.14; *see also Liparota v. United States*, 471 U.S. 419, 432 (1985) ("[T]he Court explicitly reserved the question whether some culpability was necessary with respect even to the jurisdictional element."). The court notes that five United States Courts of Appeals have held, since *Yermian* was handed down, that no mental state is required with respect to federal involvement in order to establish a violation of § 1001. *United States v. Heuer*, 4 F.3d 723, 733 (9th Cir. 1993), *cert. denied*, 510 U.S. 1164 (9th Cir, 1994); *United States v. Law enforcement officer*, 941 F.2d 181, 190 (3rd Cir. 1991); *United States v. Bakhtiari*, 913 F.2d 1053, 1060-61 (2d Cir. 1990), *cert. denied*, 499 U.S. 924 (1991); *United States v. Gibson*, 881 F.2d 318, 323 (6th Cir. 1989); *United States v. Suggs*, 755

32

F.2d 1538, 1542 (11th Cir. 1985); *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir. 1984), *cert. denied*, 474 U.S. 925 (1985).

In *Green*, the Ninth Circuit Court of Appeals explained that:

> We are now squarely presented with the question reserved in *Yermian*. In deciding this matter of first impression, we have carefully reviewed the Supreme Court's decision in *Yermian* as well as the language and legislative history of section 1001. We are persuaded that no mental state is required with respect to federal involvement in order to establish a violation of section 1001.
>
> First, no mental state with respect to federal jurisdiction is evident from the language of section 1001. There are simply no adverbs or phrases modifying the jurisdictional requirement. As the Supreme Court observed in *Yermian*:
>
>> [t]he statutory language requiring that knowingly false statements be made 'in any matter within the jurisdiction of any department or agency of the United States' is a jurisdictional requirement. Its primary purpose is to identify the factor that makes the false statement an appropriate subject for federal concern.
>
> *Id.* at ----, 104 S. Ct. at 2940.
>
> Second, the legislative history of section 1001 supports the conclusion that Congress did not intend to require jurisdictional knowledge. The original Act from which section 1001 is derived was narrowly drawn to proscribe false claims by military personnel against the government. Act of March 2, 1863, ch. 67, 12 Stat. 696. From 1863 until 1918, this original Act was subject to minor changes, including a revision making the Act applicable to "every person" and not just military personnel. Act of December 1, 1873, approved June 22, 1874.
>
> In 1918, the Act was further revised and the false statement provision relevant to this discussion was added. Act of

33

October 23, 1918, ch. 194, 40 Stat. 1015 (1918 Act). The 1918 Act was interpreted narrowly to proscribe only false statements made with intent to cause pecuniary or property loss to the federal government. *United States v. Cohn*, 270 U.S. 339, 46 S. Ct. 251, 70 L.Ed. 616 (1926). In so interpreting that statute, the Supreme Court rejected the government's contention that the 1918 Act should be construed broadly as prohibiting any interference with or obstruction of one of the government's functions by fraudulent means. *Id.* at 346, 46 S. Ct. at 253.

In response to this narrow construction of the federal false statements statute, Congress undertook to amend that statute in 1934. The 1934 provision, which was eventually enacted into law, broadened the scope of the false statements statute by omitting the specific intent language. Act of June 18, 1934, ch. 587, 48 Stat. 996. Congress' purpose in amending the 1918 Act was to remove the prior limitation on the statute's coverage to cases involving pecuniary or property loss to the government and to extend the Act's coverage to those deceptive practices which might result in the frustration of authorized government functions. *United States v. Gilliland*, 312 U.S. 86, 93, 61 S. Ct. 518, 522, 85 L.Ed. 598 (1941).

Finally, appellant argues that absent some state of mind requirement, section 1001 becomes a "trap for the unwary." To the contrary, the Court in *Yermian*, in response to this argument noted that "[i]n the unlikely event that § 1001 could be the basis for imposing an unduly harsh result on those who intentionally make false statements to the Federal Government, it is for Congress and not this court to amend the criminal statute." 468 U.S. 63, 104 S. Ct. at 2943. The short response to appellant's concern that absent a culpability requirement section 1001 becomes a trap for the unwary therefore is simply that Congress intended to cut a broadcloth.

While we understand appellant's concerns, we observe that section 1001 explicitly incorporates certain limitations which guard against its being so highly penal as to be infirm. First,

in order to be within the scope of section 1001, the false statement must involve a matter within federal agency jurisdiction at the time it was made. Second, a person is guilty of violating section 1001 only if he "knowingly and willfully" makes a false statement. A person who knowingly and willfully makes a false statement cannot be deemed to have engaged in entirely innocent conduct. Finally, section 1001 has been construed as being applicable only to material misstatements or falsehoods. *Duncan*, 693 F.2d at 975; *United States v. Carrier*, 654 F.2d 559, 562 (9th Cir. 1981).

No culpable mental state must be proved with respect to federal agency jurisdiction in order to establish a violation of section 1001. The trial judge did not abuse his discretion in refusing to give an instruction on jurisdictional knowledge.

*Green*, 745 F.2d 1209-11.

In *Bakhtiari*, the Second Circuit Court of Appeals also concluded that no mental state is required with respect to federal involvement in order to establish a violation of § 1001, observing:

While the Supreme Court in *Yermian* did not have to decide whether some standard of jurisdictional awareness less than actual knowledge is required, its opinion nonetheless provides strong support for our conclusion that it is not.

The jurisdictional language was added to the current provision *solely to limit the reach of the false-statements statute to matters of federal interest* . . . Whether or not [appellant] fairly may characterize the intentional and deliberate lies prohibited by the statute (and manifest in this case) as "wholly innocent conduct," this argument is not sufficient to overcome the express statutory language of § 1001. [Appellant] does not argue that Congress lacks the power to impose criminal sanctions for deliberately false statements submitted to a federal

Case 5:04-cr-04082-MWB    Document 151    Filed 07/28/05    Page 35 of 41

agency, *regardless of whether the person who made such statements actually knew that they were being submitted to the Federal Government.* That is precisely what Congress has done here.

*Yermian*, 468 U.S. at 74-75, 104 S. Ct. at 2942-43 (emphasis added, citation omitted).

Although somewhat conflicting language is discernible in *Yermian*, *see* 468 U.S. at 75 n.14, 104 S. Ct. at 2943 n.14, the Court's opinion, read as a whole, leaves no doubt that Congress--through § 1001--acted within its powers to criminalize the issuance of an intentionally false statement within the jurisdiction of a federal department or agency, regardless of the defendant's awareness that the statement will be so delivered. The footnote in *Yermian* relied upon by appellant establishes only that the defendant in that case at the very least got more than he deserved--a jury instruction on reasonable foreseeability. The dissent in *Yermian*--on which appellant also relies--misreads the majority's opinion as "proceed[ing] on the assumption that some lesser culpability standard is required in § 1001 prosecutions. . . ." *Id.* at *1061 76, 104 S. Ct. at 2943 (Rehnquist, J., dissenting). No such assumption is made; rather, the Court simply notes what it has not been called on to decide. To the contrary, the majority opinion strongly suggests that no culpability standard is appropriate with regard to the jurisdictional element of the statute.

That conclusion, moreover, is the only one that can be squared with the plain language of the statute itself. If Congress had intended to include a reasonable foreseeability element in the jurisdictional portion of the statute, then it could easily have done so. As the statute stands, the government must prove the statement false, that it involved a matter within federal agency jurisdiction at the time it was made, and that the defendant "knowingly and willfully" made the false statement. The government's burden in the present case, while not as severe as the defendant would like, is not insubstantial.

36

The legislative history of § 1001 also lends support to our conclusion, as it suggests that Congress intended the statute to be read broadly. In 1926, the predecessor act to § 1001 was interpreted narrowly by the Supreme Court to proscribe only false statements made with intent to cause pecuniary or property loss to the federal government. *See United States v. Cohn*, 270 U.S. 339, 46 S. Ct. 251, 70 L. Ed. 616 (1926). *Cohn* rejected the government's contention that the act should be read broadly to prohibit any interference with one of the government's functions. *Id*. at 346, 46 S. Ct. at 253. In response to the Court's narrow reading, Congress eventually amended the act by omitting the specific intent language and thus extended the act's coverage to deceptive practices not only that were intended to cause pecuniary or property loss to the government, but also those which might frustrate government functions. *See United States v. Gilliland*, 312 U.S. 86, 93, 61 S. Ct. 518, 522, 85 L. Ed. 598 (1941) ("The statute was made to embrace false and fraudulent statements or representations . . . [with] no restriction to cases involving pecuniary or property loss to the government."). As the Court recently explained, "Noticeably lacking from [the amendment] is any requirement that the prohibited conduct be undertaken with specific intent to deceive the Federal Government, or with actual knowledge that false statements were made in a matter within federal agency jurisdiction." *Yermian*, 468 U.S. at 73, 104 S. Ct. at 2941. "That Congress did not include such language," *id.*, and chose not to include a reasonable foreseeability requirement either, "provides convincing evidence that the statute does not require actual knowledge," *id.*, or even proof that federal jurisdiction was reasonably foreseeable.

In addition, the Supreme Court has consistently held that the jurisdictional clause of § 1001 should be given a broad interpretation. *See United States v. Rodgers*, 466 U.S. 475, 479-84, 104 S. Ct. 1942, 1946-49, 80 L. Ed.2d 492 (1984); *Bryson v. United States*, 396 U.S. 64, 71, 90 S. Ct. 355, 359, 24 L. Ed.2d 264 (1969); *see also United States v. Bramblett*,

> 348 U.S. 503, 507, 75 S. Ct. 504, 507, 99 L. Ed. 594 (1955)
> ("There is no indication in either the committee reports or in
> the congressional debates that the scope of the statute was to
> be in any way restricted."). Moreover, "[i]n the unlikely
> event that § 1001 could be the basis for imposing an unduly
> harsh result on those who intentionally make false statements
> to the Federal Government, it is for Congress and not this
> Court to amend the criminal statute." *Yermian*, 468 U.S. at
> 75, 104 S. Ct. at 2943 (footnote omitted).

*Bakhtiari*, 913 F.2d 1060-61. The court concludes that the reasoning of the *Green* and *Bakhtiari* decisions is unimpeachable with regard to the question at hand. The court rejects defendant Hinman's reliance on the Eighth Circuit Court of Appeals's almost fifty-year-old decision in *Ebeling v. United States*, 248 F.2d 429 (8th Cir. 1957), since the *Ebeling* decision was handed down prior to the Court's decision in *Yermian* and therefore cannot be deemed authoritative precedent for determination of *Yermian*. Therefore, the court overrules defendant Hinman's objections to this portion of Judge Zoss's Report and Recommendation.

### ii.    Count 6

Defendant Hinman also objects to Judge Zoss's conclusion that 18 U.S.C. § 1516 contains no scienter requirement with respect to the jurisdictional prerequisites for a conviction under the statute. Defendant Hinman argues that Count Six of the Superceding Indictment fails to allege a violation of 18 U.S.C. § 1516 because it "fails to sufficiently allege an intent to deceive the United States." *See* Doc. No. 91, p. 6. Defendant Hinman contends that an "intent to deceive" requires a "level of knowledge that the alleged misrepresentation or omission would or should be communicated to the federal government." *Id.* In response to defendant Hinman's objection, the government asserts that intent to deceive the United States is an element of a § 1516 offense but that the

38

indictment in this case is sufficient since it alleges the requisite intent.

Section 1516 provides in relevant part:

> (a) Whoever, with intent to deceive or defraud the United States, endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties relating to a person, entity, or program receiving in excess of $100,000, directly or indirectly, from the United States in any 1 year period under a contract or subcontract, grant, or cooperative agreement, or relating to any property that is security for a mortgage note that is insured, guaranteed, acquired, or held by the Secretary of Housing and Urban Development pursuant to any Act administered by the Secretary, or relating to any property that is security for a loan that is made or guaranteed under title V of the Housing Act of 1949, shall be fined under this title, or imprisoned not more than 5 years, or both.

18 U.S.C. § 1516. It is clear from the plain language of § 1516 that intent to deceive or defraud the United States is a required element of the offense. Count 6 of the Second Superceding Indictment alleges the following:

> Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, *with intent to deceive the United States,* endeavored to influence, obstruct, and impede a Federal auditor, namely a DIA surveyor, in the performance of official duties relating to an entity, namely Indian Hills, that received in excess of $100,000, directly or indirectly, from the United States in a one year period that included June 1999, under a contract, subcontract, grant, and cooperative agreement.
>
> This in violation of Title 18, United States Code, Sections 1516 and 2(a) & (b).

Second Superceding Indictment at ¶ 14 (emphasis added).

Here, Count 6 of the Second Superseding Indictment does identify the statute that defendant Hinman has allegedly violated, 18 U.S.C. § 1516, as required by Rule 7(c)(1) of the Federal Rules of Criminal Procedure. *See Carter*, 270 F.3d at 736. Thus, whether Count 6 of the Second Superseding Indictment states an offense under § 1516 depends principally upon whether "on its face . . . it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which [Hinman] must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *Carter*, 270 F.3d at 736). The court concludes that Count 6 does meet this requirement because the statutory language contains all of the necessary elements of the offense and the Second Superceding Indictment tracks that statutory language. Count 6 of the Second Superseding Indictment describes defendants' scheme in detail and provides dates, places and the persons involved. Thus, because the alleged scheme is set forth with sufficient particularity to enable defendant Hinman to prepare for trial and to enable him to set it up in bar of a later prosecution, the court concludes that Count 6 of the Second Superceding Indictment is sufficient on its face to place defendants on notice of the charge they are being forced to meet. Therefore, the court further overrules defendant Hinman's objection to this portion of Judge Zoss's Report and Recommendation.

### iii.    Count 1

Defendant Hinman finally objects to Judge Zoss's recommendation that the court deny defendant Hinman's motion to dismiss with respect to Count 1. Defendant Hinman argues that since the substantive counts of the indictment are insufficient to state an offense then the conspiracy allegations contained in Count 1 which are based on the substantive counts must also be found to be deficient. The flaw in this contention is that the court has

40

concluded that the substantive counts are not deficient. Therefore, the court also overrules defendant Hinman's objection to this portion of Judge Zoss's Report and Recommendation.

### III. CONCLUSION

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendations and **denies** defendants' motions to dismiss (#106, #113 and #127).

**IT IS SO ORDERED.**

**DATED** this 28th day of July, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA